THE ÆTNA NATIONAL BANK *vs.* OLIVER F. WINCHESTER.

The defendant in 1867 endorsed the notes of C for his accommodation, to the amount of $7,000, and continued to endorse for him to the same amount for purposes of renewal or payment, till 1873. In 1869 the plaintiffs, a bank, discounted some of these notes to the amount of $5,000 for C, and continued a line of discounts of the same amount and upon the same endorsements till 1873. At this time C, having received from the defendant his endorsement upon a note of $2,000, the note being in all respects complete, fraudulently altered the amount to $5,000, and procured its discount by the plaintiffs, who took it without suspicion, and with the proceeds C took up his notes at the plaintiffs' bank for $5,000, upon $4,000 of which the defendant was endorser, the bank discounting the note for the purpose of applying the proceeds in that manner. C had formerly been in the defendant's employment and had his entire confidence, and the defendant had been in the habit of endorsing paper

sent to him for that purpose by *C* without making any entry of the transaction, and in several instances had endorsed notes in which the time of payment was left blank.   In assumpsit against the defendant as endorser of the altered note, it was held—

1.   That the court could not, from all these facts, infer an agency on the part of *C*, under which his act in altering the note would be binding upon the defendant.

2.   That the negotiation of the altered note to the plaintiffs did not render the defendant liable on his endorsement, as an act in the apparent exercise, and within the apparent scope, of an agency on the part of *C*.

3.   That the principle that, where one of two innocent persons must suffer by a fraud, he who furnished the means for committing the fraud should bear the loss, had no application to the case, as the defendant, having delivered the note to *C* complete, could not be regarded as having furnished him the means of committing the fraud.

4.   That the rule that holds an endorser liable although the note is used in a different manner from that intended by him, did not apply, as in such cases the contract is still the genuine contract of the indorser.

5.   That the defendant was not estopped by the facts from denying his liability upon the endorsement.

ASSUMPSIT against the defendant as an endorser of a promissory note; brought to the Superior Court in Hartford County. The following facts were found by a committee.

The note in suit, as described in the declaration and as it appears upon its face, is for $5,000, and is dated July 1st, 1873, is signed by James H. Conklin, is made payable to the order of Oliver F. Winchester, the defendant, at the bank of the plaintiffs, in four months from its date, and is endorsed by the defendant.   As originally written, it was for the sum of $2,000 only, and as such was endorsed by the defendant; and after being so endorsed was returned to the maker to be negotiated, to take up or provide for other notes, upon which the defendant was then endorser as hereinafter stated, and while so in his hands, and before negotiation, and without the knowledge or consent of the defendant, it was altered by the maker to a note for $5,000.

About the year 1867, the defendant commenced endorsing notes for Conklin, for his accommodation, and endorsed to the amount of $7,000; which notes as they became due were renewed or provided for with other notes endorsed in like manner, and returned to Conklin to be negotiated for that purpose; and the latter as they fell due, from time to time,

were renewed or provided for as before, and in that manner the line of endorsement by the defendant continued until in 1873, as hereinafter stated.

In the year 1869 Conklin began to have a portion of these notes, to the amount of $5,000, discounted by the plaintiffs. That line of discount was carried from September, 1869, to July, 1873.   On the 7th of July, 1873, Conklin enclosed to the defendant four promissory notes, all signed by him, and payable to the order of the defendant, as follows: one dated June 25th, 1873, at four months, for $1,000, due October 28th, and paid by the defendant; one dated July 1st, at four months, for $2,000, being the note now in suit; one dated July 5th, at three months, for $1,000, due October 8th, and paid by the defendant; and one dated July 7th, at three months, for $1,000, due October 10th, also paid by the defendant.

On the same day the plaintiffs held notes of Conklin, as follows: one due July 6th, 1873, for $1,000, endorsed by the defendant; one due July 16th, for $1,000, endorsed by William R. Cone; one due July 18th, for $2,000, endorsed by the defendant; and one due August 7th, for $2,000, endorsed by the defendant.   The note of July 6th was then due, had been duly protested, and notice of its non-payment given to the defendant.

The four notes dated, respectively, June 25th, July 1st, July 5th, and July 7th, were endorsed by the defendant for the purpose of enabling the maker to take up or provide for the notes thus held by the plaintiffs, amounting to $5,000, and which were endorsed by the defendant.   And after the notes were so endorsed they were returned by him to Conklin to be negotiated for that purpose.

The note dated July 5th, for $1,000, was sent by Conklin on the 14th of July to the plaintiffs for the purpose of taking up the note for the same amount due July 6th, and was used for that purpose.   The other two notes, for $1,000 each, were used by Conklin, who procured them to be discounted by other parties, and were afterwards taken up by the defendant.   The note for $2,000, dated July 1st, was altered to $5,000 by the maker in his own handwriting, and is the note in suit.   This

note was discounted by the plaintiffs July 18th, and the proceeds used to take up the note endorsed by Mr. Cone, for $1,000, falling due July 16th, 1873, and also the two notes endorsed by the defendant for $2,000 each, and falling due, one July 18th, and the other August 7th, 1873; Conklin having so directed in the letter enclosing the note to the plaintiffs.

The first notes endorsed by the defendant for Conklin, amounting to $7,000, were endorsed for his accommodation. The other notes were also accommodation notes, as between the maker and the endorser, and the defendant had no interest in, and derived no benefit from them, except as they were designed and used to renew or provide for other notes upon which the defendant was then endorser.

The notes discounted by the plaintiffs were all blank forms, filled in by the maker in his own handwriting, as is also the note in suit.   This was true also of the other notes endorsed by the defendant, and discounted by other parties; and all the notes were payable to the order of the defendant.

At the time the note in suit was discounted by the plaintiffs they had no knowledge or suspicion that it had been altered. The note would not have been taken or discounted but for the endorsement of the defendant.

The note was taken in the usual course of business, and the plaintiffs are *bonâ fide* holders thereof, except as it may appear otherwise from the facts hereinafter stated.

Previous to April 9th, 1873, the defendant occasionally, (perhaps half a dozen times,) endorsed notes for Conklin, with the length of time they were to run left blank, for Conklin to fill the blanks as he might have need.   The note in suit, and those accompanying it, were, at the time of the endorsement, complete in all respects.

Previous to January 1st, 1873, the defendant kept no record or memoranda of the notes endorsed by him for Conklin, except as he kept the letters sent by him with the notes when they were sent for endorsement.   Since January 1st, 1873, he has kept a record of his endorsements.

During the time of these endorsements Conklin resided in Hamden, about three miles from the defendant, and his daily

employment was in the city of New Haven, about one and a quarter miles distant from the defendant.   He had been in the defendant's employment as a book-keeper about a year before the endorsements commenced, and during that time acquitted himself with honesty and fidelity, so far as the defendant knew.

The note in suit was not paid when due, and was duly protested for non-payment, and notice thereof was duly given to the defendant as endorser.

Upon the facts thus found the case was reserved for the advice of this court.

*R. D. Hubbard*, for the plaintiffs.

It has always been the policy of the commercial law that negotiable notes should stand largely protected in the hands of *bonâ fide* holders against those who have issued them, or given them currency, whether as makers or endorsers.   *Goodman* v. *Simonds*, 20 How., 343, 364.   So far is this immunity carried, that a negotiable note stolen before or after negotiation, will bind both maker and indorser in the hands of a *bonâ fide* holder for value.   *Worcester County Bank* v. *Dorchester Bank*, 10 Cush., 488; *Brush* v. *Scribner*, 11 Conn., 391; *Peacock* v. *Rhodes*, 2 Doug., 633.   This is doubly true where such instruments have been placed in the hands of agents for negotiation, under circumstances which enabled the agent to practice fraud, and where third persons trusting to the apparent authority of such agent have been imposed upon by the fraud of the agent.   We do not claim that a fraudulent alteration of a note will not, as an ordinary rule, avoid the note, as against the party injured by such alteration. 1 Parsons Notes & Bills, 275.   But here, 1st, the alteration was made by the defendant's agent in the course and business of the agency; 2d, the defendant had clothed his agent with special facilities for committing the fraudulent act, and an apparent authority to do the act, as a natural means for accomplishing the purposes of the agency; and 3d, the act was done for the benefit of the defendant, and the proceeds applied to his use.

1.   Conklin was the defendant's agent in the transaction under consideration.

The defendant was holden to the plaintiffs as indorser on sundry notes then becoming due.   It was his duty to provide for them at maturity.   This he intended and expected to do by other indorsements.   His duty to the plaintiffs was not the less positive by reason of the fact that Conklin was maker of the notes.   If, as between the defendant and Conklin, the latter was bound to protect the former, this was so only as between themselves.   As between the plaintiffs and defendant, the latter was bound, and bound for himself, and for himself alone.   He was interested to protect himself against dishonor, and bound to take the necessary measures to that end.   He therefore placed his endorsement in the hands of Conklin, for the purpose and with authority to negotiate it to the plaintiffs in extinguishment of his prior endorsements.   Conklin, therefore, in holding this indorsed note for negotiation, in presenting it to the plaintiffs for discount, and in receiving and applying the proceeds to the defendant's prior endorsements, was acting no less on the defendant's behalf than on his own, and was as much the defendant's agent as if he had held a written power of attorney to do the acts mentioned.   But not only was Conklin the defendant's agent in uttering this note to the plaintiffs, and in applying the proceeds to Conklin's benefit, but when sent on his errand by the defendant, he was equipped by him with the most apt means of deceiving the plaintiffs.   The body of the note was in Conklin's handwriting.   The defendant entrusted the note to the self-same fingers that wrote it.   Those fingers were as apt at re-writing as at writing, and the handwriting of the original and the altered note being one and the same, the alteration would naturally escape detection.   It is as if a man should send out his agent with paper or coin for negotiation in the market, and should, at the same time, furnish him with the most skillful implements of counterfeiting and forgery. The defendant, then, being himself responsible for the deceptive character of the token by which the fraud was effected, and the fraud having been effected by his agent in the exercise

of his agency, and the fruits of the fraud having been applied to the defendant's use and benefit, the defendant himself should suffer the consequences. *Burson* v. *Huntington,* 21 Mich., 433.

2. But it will be said that Conklin was a limited agent, and having no authority to utter the note in its altered form, his acts must be judged by the actual, and not the supposed or apparent authority possessed.

A limited agent undoubtedly he was, as between himself and the defendant; but not as between the defendant and the public, and particularly as between the defendant and the plaintiffs. The case finds that the defendant had been in the habit of wholesale endorsements for Conklin, by a continuous line of renewals, extending from 1867 to 1873. In 1869 a portion of these endorsements commenced at the plaintiffs' bank, and continued in successive renewals, and in notes of varying amounts, aggregating, from time to time, from $5,000 to $10,000, till July, 1873, during all which time Conklin was the sole actor for both maker and indorser, in conducting the whole line of negotiations with the plaintiffs.

Conklin had been book-keeper for the defendant, resided in his neighborhood, and had his entire confidence, so much so that the defendant kept no record of his indorsements, and at times issued his indorsements in blank as to time of payment, leaving Conklin to fill the blanks as he might have need. And this whole mass of paper, indorsed by the defendant, and committed to Conklin for negotiation in the market, to continue this long and unbroken line of renewals, was filled up, in every instance, in the handwriting of Conklin, like the note now in suit. Here, then, we have, not a single case of authority, but a multitude of cases. And they demonstrate, we submit, a general authority to negotiate the defendant's indorsements, as well as a most unhesitating and plenary confidence reposed in the agent. Story on Agency, §§ 18, 19.

3. But even if Conklin were to be regarded as a limited agent, the facts above recited conferred an *apparent* authority which would bind the defendant to any act of the agent lying within the range of this apparent authority.

"Whoever deals with an agent constituted for a special purpose, deals at his peril, when the agent passes the limit of his power. We would not, however, adhere so closely to the terms of this rule as to do injustice to innocent third parties, who have acted in the confidence of an apparent authority for which the principal is justly responsible." *Bristol Knife Co.* v. *First Nat. Bank,* 41 Conn., 425; Story on Agency, §§ 18, 19. What, now, was the *primâ facie* import of the defendant's blank indorsement? "The law is unquestionably settled that the indorsement of a bill or note warrants the genuineness of all the preceding signatures, and not only that, but the *genuineness of the note and bill itself.*" 2 Parsons Notes & Bills, 589. What, next, was Conklin's authority in respect to the note bearing this indorsed warrant of genuineness? Obviously this: To hold the indorsement for the purpose of getting the note discounted on its guaranty, to present, transfer, and deliver the indorsement to the plaintiffs; and thereby to warrant the note as genuine, and to receive and apply the proceeds. *Terry* v. *Bissell,* 26 Conn., 38. Without undertaking to say that Conklin is to be taken to have been the defendant's agent in altering the note, and without discussing the question whether he was in the execution of an act of agency when he altered it, this at least seems to be certain, that in presenting and transferring the indorsement to the plaintiffs he was in the *apparent* exercise of his agency, and within its apparent scope. If this be so, it follows that when Conklin tendered to the plaintiffs this altered contract of indorsement, and transferred it, he thereby, and in the very execution of an act of agency, *dum fervebat opus,* represented and warranted the genuineness of the note. That the warranty, as applicable to the altered note, was fraudulent, and without actual authority, is not to the purpose. Is or not the defendant estopped by the act and accompanying warranty, fraudulent and unauthorized though it may have been? This is the pivot of the controversy. "The representations of the agent about the subject matter of a contract which he is negotiating for his principal, will, *if made during the course of that negotiation,* bind the latter." Smith's Com-

mercial Law, 66. "A principal is held liable to third persons in a civil suit for the frauds, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances and omissions of duty of his agent, in the course of his business, although the principal did not authorize, or justify, or participate in, or indeed know of, such misconduct, or even forbade them or disapproved of them. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby in effect he warrants his fidelity and good conduct in all matters within the scope of the agency." Story on Agency, § 452.

4. The fraudulent alteration of the note did not terminate the agency as against a *bonâ fide* holder taking it in the usual course of business, and without knowledge, suspicion, or cause for suspicion, of the alteration.

Suppose an agent for the sale of wines adulterates them fraudulently whilst in his custody, and then fraudulently sells them for pure. Suppose a silversmith's agent, intrusted for sale with bars of silver of a given assay, fraudulently alloys the silver and fraudulently sells them as of the original or of any other assay. Is not the principal answerable in either case for the fraud? A party claiming a fund in the hands of a third person, who, through his agent authorized to draw the money, obtains it by forged vouchers of title, is responsible for the fraud of the agent, though ignorant of the misconduct of the agent. "I will assume that the defendant was not privy to the fraud; but his father was his agent, and for the frauds of an agent the principal is *civilly* liable." Per Ld. Ellenborough, in *Crockford* v. *Winter*, 1 Camp., 125. An agent beyond sea sold a certain parcel of silks as and for a certain kind of silks. The silks were not of the kind represented. There was no actual deceit in the merchant. It was in the factor beyond seas. Held by Holt, C. J., "The merchant was answerable for the deceit of his factor, though not *criminaliter*, yet *civiliter;* for, seeing somebody must be a loser by this deceit, it is more reason that he who employs, and puts a trust and confidence in the deceiver, should be a loser, than a stranger. *Hern* v. *Nichols*, 1 Salk., 289. To the same

effect are the cases of *Armory* v. *Delamirie*, 1 Strange, 504, and *Grammar* v. *Nixon*, 1 id., 653.   The doctrine of these cases is fully recognized by the best modern authorities. Story on Agency, § 453; Paley on Agency, 301; Smith's Commercial Law, 70.   This rule of estoppel is still more liberal in favor of the integrity of commercial paper, in the hands of *bonâ fide* holders for value.   Conklin had certainly as much actual power to alter the defendant's endorsement as to steal it.   The fraudulent alteration would have been, at the common law, a misdemeanor only; the stealing would have been a felony.   Yet, if Conklin had actually stolen the defendant's indorsement, and uttered it to the plaintiffs for the defendant's use and benefit, could the defendant have avoided his indorsement, on the ground of a want of authority to steal or utter stolen paper?   Manifestly not.   How, then, on any analogy or principle of reason, avoid his indorsement on the ground that Conklin had no right to alter the note, or utter it when altered; above all when, as in this case, the whole previous course of dealing, the surrounding circumstances, the representations of the agent, the instrument itself, and the apparent guaranty of the indorsement, seemed to indicate a plenary authority on the part of the agent to do the act in question.   Says Chancellor Kent, in a suit against an accommodation indorser, on a note altered by the maker, after indorsement, and before negotiation, and used, as in this case, for the renewal of other similar accommodation paper of the same parties:—"The maker sent the note for discount to a bank in New York, where a former note, drawn and indorsed by the same parties, had been discounted, and which this was intended to meet, and he made a memorandum in the margin of the note that it was to be paid there.   *   *   * The bank receive and discount the note for the use of the maker, in renewal of the former note, and most innocently follow the direction of the memorandum, and consider the bank as the place where the note, when due, was to be demanded and paid.   These endorsees had a right to consider that memorandum as made with the knowledge and consent of the endorser, and if there was a deception practiced upon

them in that respect, the endorser enabled the maker to do it by returning the note back into his possession with a blank endorsement, without any place of payment designated. * * It is perfectly immaterial whether the memorandum was made with the consent or against the consent of the indorser. It is sufficient that the holder had a right to presume that consent, and that the indorser gave the maker the means and the opportunity so to act and direct, and upon every principle of law and justice the *bonâ fide* holder ought not to suffer, even if the maker, in this respect, abused the confidence of the indorser." *Woodworth* v. *Bank of America*, 19 Johns., 402.

5. The case, then, falls within the principle that if one of two innocent persons must suffer from the fraud of a third, he who sends out that third to act on his behalf, and equips him with the means of committing that fraud, should— no matter how innocent himself—take the consequences. *Brush* v. *Scribner*, 11 Conn., 392; *Thames Steamboat Co.* v. *Housatonic R. R. Co.*, 24 id., 54. To suffer the defendant to escape liability on this note, drawn in the handwriting of the maker, indorsed by the defendant, and entrusted for custody and negotiation to the very hands that drew it, discounted on the credit of the defendant, and for his use and benefit, would be to enable him to take advantage of the fraud of his own agent, committed to our injury and for his benefit; and to repudiate the fraud of his agent for the purpose of avoiding the contract, and yet, at the same time, retain all the fruits of the fraud.

*J. S. Beach*, for the defendant.

The facts found by the committee relevant to the issue, are, *first*, that the note as originally written was for the sum of $2,000 only, and as such was endorsed by the defendant; and after being so endorsed was returned by him to the maker, and while in the hands of the maker, and before negotiation, it was, without the knowledge or consent of the defendant, altered by the maker to a note for $5,000; *second*, that the note was not paid at maturity, was duly protested,

and notice of non-payment given to the defendant; and *third*, that the defendant was an accommodation endorser and had no interest in, and derived no benefit from, the proceeds of the discount of the note. We suppose it will not be questioned that if the finding of the committee disclosed no other facts than these, the law would hold the defendant discharged from all liability upon this note. For it is an elementary rule that the law holds no one liable by reason of his name appearing upon a promissory note, which note, after the putting of his name thereon, has been without his procurement, aid, or consent, altered in any material point; for the reason, obvious alike to laymen and to lawyers, that the contract it purports to evidence is no longer *his* contract. We contend that none of the remaining facts set forth in the report of the committee affect the relative rights and equities of these parties as based upon, or emanating from, the written instrument.

1.   It does not affect the case that the note was discounted by the bank without any suspicion that it had been altered. This fact can confer no additional rights upon the plaintiffs unless they trace their absence of suspicion to some act of the defendant which he ought not to have done, or to the omission by him of some act which he ought to have done. No such act or omission is disclosed by this record. The committee find that the note when presented to the defendant for his endorsement was in the ordinary form, with all the blanks for date, amount, time and place of payment, filled in by the maker, in his own hand writing, signed by him, and that it was " complete in all respects." *Redlich* v. *Doll*, 54 N. York, 234; *Rainbolt* v. *Eddy*, 34 Iowa, 440; *Garrard* v. *Haddan*, 67 Penn. S. R., 82; *Brown* v. *Reed*, 79 id., 370. In the last case the court say: " If the maker of a note has used ordinary care and precaution, he would be no more responsible on an altered instrument than he would be upon a skillful forgery of his hand writing. In this case, whether there has been negligence in the maker was clearly a question of fact for the jury." The chasm between the cases in which the maker has been held responsible upon an altered

note, and this case, is deep and broad. There, negligence was claimed and proved as the basis of recovery against the principal debtor; here, there is no negligence claimed or proved against a defendant who is a mere surety.

2. The history of the prior dealings of the bank with Conklin, and of their discounts for him of paper bearing the defendant's endorsement, has no relevancy to the issue. That paper has long since matured and been paid. The only supposed relevancy of this history must reside in the claim that the proceeds of this altered note went in payment of a prior note or notes on which the defendant was endorser. It is found that they were applied by the bank to take up the two notes of $2,000 each, due July 18th and Aug. 7th, endorsed by the defendant, and a note of Conklin for $1,000, due July 16th, endorsed by Mr. Cone. We repeat, that the only pertinency in the history of these notes, and of their discounts, would seem to be limited to the suggestion, that if the fraud practiced by Conklin upon the bank had proved unsuccessful, the defendant *might* have been compelled to pay the two notes of $2,000 each due July 18th and Aug. 7th, on which he was endorser, and to the assumed corollary that the defendant attempts to rely upon the success of Conklin's fraud for his defence. But enforcing this note would result not simply in protecting the bank against the loss consequent upon Conklin's fraud, but in transposing it from the bank upon the defendant; for it was the success of the fraud that enabled Conklin to put off upon outside parties the two notes of $1,000 each, dated June 25th and July 7th, which the defendant has paid; and a further result would be that upon Conklin's note of $1,000 dated July 16th, upon which Mr. Cone was endorser, he would be discharged and the defendant put in his place. But the more logical and conclusive answer is that the suggestion itself and its supposed corollary rest upon unsound premises. The defendant was never under any liability, legal or equitable, to pay the bank any portion of the two notes of $2,000 each, due July 18th and Aug. 7th, on which he was endorser. 1*st*. There was no legal liability. His contract with the bank was that in the event of the non-

payment of the note by the maker at maturity, he would assume its payment upon condition of his receiving prompt notice of the failure to pay by the maker. The contingency never happened. The notes were paid before they matured. The condition was never performed. *Ray* v. *Smith*, 17 Wall., 414. 2*d.* The bank had no equities in its favor against the defendant which they could invoke to aid them in compelling him to pay the two notes of $2,000 each, due July 18th and Aug. 7th. Their legal rights as against this accommodation endorser—a mere surety—being fixed, they have found the measure and the limit of their equitable rights. *Bank of U. States* v. *Jackson's Admx.*, 9 Leigh, 221, 230; *Page's Admrs.* v. *Bank of Alexandria*, 7 Wheat., 37; *Butler* v. *Rawson*, 1 Denio, 106; *Wells* v. *Girling*, 8 Taunt., 737.

3. There are some other facts admitted by the defendant, claimed by the plaintiffs, and at their request spread upon the record, such as the relative distance between the residence of Conklin and that of the defendant, the relative distance of Conklin's place of business from the defendant, his previous employment by the defendant, and the fidelity with which he discharged his duties, &c., the pertinency of which it is difficult to detect, unless the plaintiffs mean to ask the Supreme Court to find, as matter of law, that the defendant was guilty of negligence in endorsing the note of one who lived so near him, and who had been in his previous employment, and had acquitted himself with honesty and fidelity; and that this negligence occasioned the plaintiffs' loss. A sufficient answer to this claim, if made, is that the committee have not, could not, and were not asked to, find negligence, and this court would not if it could, and could not if it would, find it as a legal deduction from these premises. If no such claim be made, then clearly these facts so spread upon the record are irrelevant to the issue.

PARDEE, J. On the 7th day of July, 1873, the defendant, having at the request and for the accommodation of one James H. Conklin endorsed a note made by him for $2,000, payable four months from date, returned the same to him to

be negotiated for the purpose of taking up other notes previously endorsed by the defendant and held by the plaintiffs. After the endorsement and delivery of this note to Conklin, he, without the consent or knowledge of the defendant, and with fraudulent intent, altered the sum named therein to $5,000, and subsequently negotiated it in this form to the plaintiffs, and they seek to recover of the defendant the amount of the altered note in the present action.

The defendant began to endorse for the accommodation of Conklin in 1867, and did so endorse several notes, aggregating $7,000. These notes, as they became due, were renewed or provided for by other notes endorsed in like manner and returned to Conklin to be negotiated for that purpose; and thus the succession of endorsements continued to 1873. In 1869 the plaintiffs discounted upon the request of Conklin these endorsed notes to the extent of $5,000; and this line of discounts was continued by the plaintiffs from September, 1869, to July, 1873, and included thirty-five different notes, upon all of which the defendant was an accommodation endorser. Of these the note in suit purported to be one; and this was discounted by them in the usual course of business, without knowledge or suspicion on their part that it had been altered.

The plaintiffs concede that, as a general rule, he who places his name as endorser for the accommodation of the maker upon a note and returns the same to him complete in form, without blanks thereafter to be filled by any person, having therein named a sum, with time and place of payment, all certain, cannot be held to any liability thereon if it is materially altered without his consent or knowledge after it has been returned by him to the maker, unless there be some fault or negligence on his part in reference to such change; inasmuch as it is not the contract which he signed, and the negotiation thereof subsequent to the alteration cannot give even a *bonâ fide* holder any right of action against him.

But, they say that the defendant is not entitled to the protection of this rule, for the reason that the alteration was made by his agent in the course and business of the agency,

and therefore he is estopped from pleading it in his defence. We have in this case the naked fact of a series of accommodation endorsements, the last of which were made with the expectation that they would be used by the maker of the note to supply the place of those previously negotiated.   The act of making and delivering these to Conklin did not of itself, as a matter of law, establish any such agency as would enable him to bind the endorser to a subsequent fraudulent alteration of the note; nor do we know of any rule which declares that in or because of repeated endorsements the law will find an agency which did not exist in the first or second.   Inasmuch as the committee has not found the agency as a matter of fact, we cannot establish it upon inference.

It is suggested that in presenting, transferring and delivering the indorsement to the plaintiffs Conklin was in the *apparent* exercise and execution of his agency and within its apparent scope.   But, he had previously destroyed the contract which he had power to deliver, and had forged another; he came to them with this last without any authority from the defendant in reference to it; in this he was acting for himself solely; he was the principal; and we do not understand that because authority had been given to him to deliver a genuine endorsement to the plaintiffs, he is in any sense to be considered as executing that power when he offered a forged one.

Nor do we think that the case presents any opportunity for the application of the plaintiffs' argument, "that if one of two innocent persons must suffer from the fraud of a third, he who sends out that third to act on his behalf and equips him with the means of committing that fraud should, no matter how innocent himself, take the consequences."

It is found that when the note was delivered by the defendant to Conklin it was complete; nothing was required by way of addition or alteration to perfect it; every blank space in the printed form having been filled there was nothing to suggest any implied authority to Conklin to write a word upon it; nothing to tempt him to alter it; nothing to facilitate the work of forgery; and, if we were at liberty to impute to the

defendant negligence upon this part of the case, we can conceive no state of facts which would relieve an endorser from liability upon an altered note; but the finding is silent as to any such fault or negligence, and we cannot find it. Of course, the fact that there are repeated pecuniary transactions between two persons implies that each possesses the confidence of the other to a certain degree. The fact that this defendant became an accommodation endorser to the extent herein stated is proof that he had confidence in Conklin's integrity; and although Conklin came into possession of the endorsement as the result of that confidence, we are unable to see as a matter of law that therefore it draws to itself responsibility for the fraudulent alteration of the note.

For reasons growing out of efforts to facilitate the business of the world by giving currency to negotiable paper, endorsers have been compelled to respond to their engagements in instances where there had been an unauthorized use of the note; compelled to respond even when the note had been stolen and negotiated by the thief. But in all of these cases suits were based upon their genuine negotiable contracts; only the manner of negotiation was contrary to their secret instructions. This falls far short of imposing upon them liabilities upon contracts which they have never made; and while an endorser is fairly chargeable with knowledge that his endorsement will be put in circulation and used for the purpose of raising money, he is not chargeable even with a suspicion that the amount of the note upon which it is placed will be fraudulently doubled; and we know of no case in which, even under the pressure of the necessity for free circulation for commercial paper, the law has taken under its protection notes fraudulently altered, as was the one now in suit. To do this would be to put an end to endorsements; for, if men cannot by the use of every precaution put any limit to their responsibility, they must cease to assume any. Every ordinary endorsement implies trust in some one. As soon as, and as long as, a note, a deed, or any other writing is in existence, there goes with it the possibility of a fraudulent alteration; and although, speaking in a physical sense, the act of

the defendant made it possible for some one to alter the face of a note which had his name upon the back, it is not true as a legal proposition that his act, by and of itself, clothed Conklin with any authority to alter the note, or put it in his power to do so in any such sense as would require the court to apply the suggested rule to the defendant and declare that he should bear the loss, rather than the plaintiffs upon whom it was originally imposed. Indeed we regard this as a misfortune which the law must leave where it fell; and we cannot see that either legal or equitable considerations require the defendant to reimburse the plaintiffs. Their claim seems to rest upon no firmer foundation than would an effort to enforce redemption of an altered bill against the bank whose name had been fraudulently used. Although the law goes far in aid of unrestricted circulation of endorsed notes, it has not insured even the *bonâ fide* holder against all possible chances of loss by fraud. When he discounts what to the eye presents itself as a note perfect in form, there yet remains an element of risk in the transaction.

At the instance of the plaintiffs the committee has found that all of the thirty-five notes which in a series of years had been discounted by them, were made payable to the order of the defendant; that they were upon printed forms, the blanks being filled by Conklin; that the defendant in perhaps six instances had endorsed notes having no time of payment therein specified and had delivered them to Conklin with leave to fill this blank in such manner as would best suit his convenience; that prior to January 1st, 1873, the defendant kept no memorandum of the notes endorsed by him other than the letters of Conklin accompanying the notes when they were sent for endorsement; that during the time of these endorsements Conklin resided three miles, and had his place of business about one mile from the defendant; and that he had been a book-keeper for him about a year before the endorsements commenced and had performed his duty honestly and faithfully so far as the defendant knew.

These facts have all been weighed by the committee, and they failed to convince him that the defendant had been guilty

of any negligence in the matter of the indorsement. There is therefore nothing in them which should estop him from saying that he never made the contract offered in evidence.

We advise the Superior Court to render judgment for the defendant.

In this opinion the other judges concurred.